**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| DONNA T. MOORE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C. A. No. 16-00031-SLR-SRF |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

### I. INTRODUCTION

Plaintiff Donna T. Moore ("Moore") filed this action on January 22, 2016 against the

defendant Carolyn W. Colvin, the Commissioner of the Social Security Administration (the

"Commissioner"). Moore seeks judicial review pursuant to 42 U.S.C. § 405(g) of the

Commissioner's October 21, 2015 final decision, denying Moore's claim for disability insurance

benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434 and

§§ 1381–1383f. The court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g).

Currently before the court are Moore's and the Commissioner's cross-motions for

summary judgment. (D.I. 10; D.I. 14) Moore asks the court to enter an award of benefits or,

alternatively, to remand her case for further administrative proceedings. (D.I. 11) The

Commissioner requests the court affirm the ALJ's decision. (D.I. 15 at 15) For the reasons set

forth below, Moore's motion for summary judgment is granted and the Commissioner's cross-

motion for summary judgment is denied. I recommend that the case be remanded for further

administrative proceedings as outlined *infra*.

## II.    BACKGROUND

### A.    Procedural History

Moore filed a DIB application on March 15, 2012, claiming a disability onset date of

February 13, 2012. (Tr. at 174–75)  Her claim was initially denied on August 15, 2012, and

denied again after reconsideration on July 26, 2013. (*Id.* at 84–96, 98–116)  Moore then filed a

request for a hearing, which occurred on June 10, 2014. (*Id.* at 50–86)  The Administrative Law

Judge, Judith A. Showalter (the "ALJ"), issued an unfavorable decision, finding that Moore was

not disabled under the Act. (*Id.* at 22–30)  The Appeals Council subsequently denied Moore's

request for review on October 21, 2015, rendering the ALJ's decision the final decision of the

Commissioner. (*Id.* at 1–6, 13–15)  On January 22, 2016, Moore brought a civil action in this

court challenging the ALJ's decision. (D.I. 1)  On June 6, 2016, Moore filed a motion for

summary judgment, and on September 22, 2016, the Commissioner filed a cross-motion for

summary judgment. (D.I. 10; D.I. 14)

### B.    Medical History

Moore was born on November 22, 1950, and was sixty-one years old on her alleged onset

date. (Tr. at 30, 174)  Moore is considered a person close to retirement age. 20 C.F.R. §

404.1563(e).  Moore has a general equivalency diploma (GED). (Tr. at 43)  She worked as an

assistant administrative secretary in 2000, and as a car salesman from January 2001 to February

12, 2012. (*Id.* at 44–45, 94)

Moore reports that she started having arthritis-type pain in the 1980s, which increased

over time. (*Id.* at 390)  In 2003, Moore was diagnosed with rheumatoid arthritis[1] by Dr. Eric

---

[1] Rheumatoid arthritis is an inflammatory autoimmune disease that typically attacks the
connective tissue of the joints, causing them to become painful, inflamed, and sometimes

Temesis, a rheumatologist. (*Id.*)  In January 2012, Moore was diagnosed with chronic fibromyalgia[2] by Dr. Maged I. Hosny. (*Id.* at 324)  After the diagnosis, Moore continued to work for a couple of weeks. (*Id.* at 256)  However, during this time, Moore experienced episodes of increased stress and syncope.[3] (*Id.* at 256)  On February 8, 2012, Adam Brownstein, M.D., wrote a letter to Moore's employer stating "she would benefit from a job with less pressure volatility." (*Id.* at 301)

Moore left her job as an automobile salesperson on February 12, 2012, after experiencing another episode of syncope. (*Id.* at 46, 255)  In May 2012, Dr. Hosny stated that Moore "is unable to do any kind of work at the present time secondary to chronic pain, fatigue, and insomnia." (*Id.* at 321)  At the same time, Moore was being treated by Dr. Harry Tam, DPM, for mid-foot degenerative foot disease.[4] (*Id.* at 342)

On August 6, 2012, Dr. Janis Chester conducted a physical evaluation and prepared a report for the purpose of Moore's disability determination. (*Id.* at 367)  Dr. Chester noted that Moore's medication regimen included Lyrica, Tramadol, Remicade, Lovastatin, Fludrocortisone, and Lasix. (*Id.*)  Moore also took Cymbalta and Ambien. (*Id.*)  Dr. Chester observed that Moore was well-nourished, well-groomed, and engaged in conversation. (*Id.* at 369)  Dr. Chester wrote that Moore was polite, but her mood was "up and down." (*Id.*)  Additionally, Moore's short-term

---

deformed. HARVARD HEALTH PUBLICATIONS: HARVARD MEDICAL SCHOOL,
http://www.health.harvard.edu/medical-dictionary-of-health-terms/ (last visited Dec. 13, 2016).
[2] Fibromyalgia is a condition that causes pain and tenderness in spots throughout the body.
HARVARD HEALTH PUBLICATIONS: HARVARD MEDICAL SCHOOL,
http://www.health.harvard.edu/medical-dictionary-of-health-terms/ (last visited Dec. 13, 2016).
[3] Snycope is the fainting or loss of consciousness caused by a temporary shortage of oxygen in the brain. HARVARD HEALTH PUBLICATIONS: HARVARD MEDICAL SCHOOL,
http://www.health.harvard.edu/medical-dictionary-of-health-terms/ (last visited Dec. 13, 2016).
[4] A degenerative disease is any disease in which the organs or tissues in the body are damaged progressively over time. HARVARD HEALTH PUBLICATIONS: HARVARD MEDICAL SCHOOL,
http://www.health.harvard.edu/medical-dictionary-of-health-terms/ (last visited Dec. 13, 2016).

and long-term memory was intact, and she showed the ability to concentrate. (*Id.*) Dr. Chester rated Moore as having a "moderate" degree of restriction of daily activities (ability to socialize with friends, attend church, etc.). (*Id.* at 371) She also rated Moore as having a "moderately severe" limitation on her ability to perform work with frequent contact with others, but a "mild" limitation on her ability to perform work with minimal contact with others. (*Id.*) Dr. Chester assigned Moore a GAF score of 47.[5]

On August 13, 2012, Dr. Patricia Chavarry completed a medical evaluation with respect to Moore's disability determination. (*Id.* at 379) During the evaluation Moore stated that she believed her fibromyalgia was in a dormant state. (*Id.*) In a questionnaire, Moore stated that she is responsible for feeding her cats, making her bed, and doing chores around the house. (*Id.* at 380) Additionally, Moore stated that she likes to garden, and prepares meals for her family. (*Id.*) Dr. Chavarry also witnessed differences in symptoms and restrictions during the evaluation. (*Id.* at 382) For example, Moore reported that she was unable to flex beyond 30 degrees at the hip during formal testing, but demonstrated full flexion without any discomfort or restriction when

---

[5] The GAF scale ranges from 0 to 100 and is used by a clinician to indicate his overall judgment of a person's psychological, social, and occupational functioning on a scale devised by the American Psychiatric Association. *Robinson v. Colvin*, Civ. No. 14-662-SLR, 2015 WL 5838469, at *4 n.9 (D. Del. Oct. 5, 2015) (citing American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* (Text Revision, 4th ed. 2000) (*DSM-IV-TR*)). A GAF of 31-40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work ...)." *Id.* A GAF of 41-50 indicates "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." *Id.* A GAF of 61-70 indicates "[s]ome mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning ..., but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.*

retrieving her belongings at the start of the evaluation when being weighed. (*Id.*) Additionally, Moore had diminished grip strength in her right hand when being formally tested, but had no difficulty retrieving her handbag containing multiple items. (*Id.*) Dr. Chavarry stated Moore's mood was normal, and no psychosis was noted. (*Id.*) Dr. Chavarry's findings were that Moore had rheumatoid arthritis, low blood pressure, hypercholesterolemia[6], depression (controlled on current medication), and fibromyalgia, with absent trigger points during the evaluation. (*Id.*) Dr. Chavarry stated that Moore's "physical findings support full functional abilities in conjunction with well controlled mood disorder on current regimen." (*Id.*)

On February 27, 2013, Joseph Keyes, Ph.D., completed a psychological functioning assessment for Moore's disability determination. (*Id.* at 389) Dr. Keyes stated Moore's intermediate memory functioning was below average/normal. (*Id.* at 390) During the evaluation, Moore demonstrated the ability to focus on basic tasks. (*Id.*) For example, Moore was able to count backwards from twenty, and recite the alphabet with no errors. (*Id.*) Dr. Keyes noted that Moore's social and interpersonal skills were appropriate. (*Id.* at 391) Moore interacted appropriately throughout the examination. (*Id.*) Dr. Keyes noted that Moore exhibited mild-to-moderate clinical symptoms of depression. (*Id.*) During the evaluation, Moore explained that she is often sad and frustrated about her declining health. (*Id.*) Dr. Keyes opined that Moore is independent in her self-care skills, and is able to perform basic household chores and tasks with the help of her family. (*Id.*) Dr. Keyes noted that Moore was able to switch and change tasks without difficulty during the evaluation. (*Id.*) Dr. Keyes concluded that Moore has an adjustment disorder with a depressed mood, and assigned her a GAF score of 65. (*Id.* at 392) Dr.

---

[6] Hypercholesterolemia occurs when there is a high level of cholesterol in the blood. HARVARD HEALTH PUBLICATIONS: HARVARD MEDICAL SCHOOL, http://www.health.harvard.edu/medical-dictionary-of-health-terms/ (last visited Dec. 13, 2016).

Keyes also completed a functional capacities evaluation form rating Moore with "none" or a "mild" degree of impairment in the majority of areas, and with a "moderate" limitation in sustaining performance in attendance and in coping with the pressures of ordinary work.[7] (*Id.* at 393–94)

In April 2013, Moore went to Dr. Brownstein complaining of an upper respiratory infection, and reported falling six times in four months. (*Id.* at 404) During the visit, Moore failed a Romberg test, and was referred to neurologist, Dr. Jay Dave. (*Id.*)

In June 2013, Dr. Hosny's nurse practitioner, Linda Ashley, FNP, reported that Moore had severe restrictions in her ability to maintain attention and concentration due to the effect of pain and/or side effects of medication. (*Id.* at 410) It was noted that Moore could only sit two hours per day and stand/walk one hour per day, could not use her hands for pushing/pulling, simple grasping, or fine manipulation, could only lift five pounds occasionally, could never perform postural activities, and had significant environmental limitations. (*Id.* at 411–12) Around the same time, x-rays showed Moore as having mild degenerative changes in her left foot, resulting in foot surgery on July 17, 2013. (*Id.* at 440, 451–53)

On February 3, 2014, Dr. Brownstein wrote a letter stating he "perceive[d] that [Moore] could work 5-10 hours per week, if her employer would allow her to set her hours on the fly, but that is simply not realistic," and that "her well-being would make her very undependable, and therefore, unreliable and unemployable." (*Id.* at 479) On February 19, 2014, Dr. Tam wrote a similar letter, stating her condition had deteriorated over the past 2-3 years, and that it was his "medical opinion that she is unable to perform work of any type." (*Id.* at 486)

---

[7] The form defined None as "no impairment in this area;" Mild as "suspected impairment of slight importance which does not affect ability to function" and Moderate as "an impairment which affects but does not preclude ability to function." (Tr. at 394)

6

On April 27, 2014, Dr. Hosny wrote a report stating that Moore had gotten progressively worse due to "chronic pain, which has caused extreme fatigue, inability to concentrate, generalized body stiffness in the morning, which can last up to two hours, short term memory loss, which is due to the combined effect of fibromyalgia and osteoarthritis[8] in addition to medications taken by the patient." (*Id.* at 493) Dr. Hosny further stated that Moore is "unable to sit or stand for more than an hour in an eight hour working day," and "unable to sit or stand for more than fifteen minutes at a time without the need to change positions secondary to pain." (*Id.*) Dr. Hosny concluded that Moore is unable to do any type of work. (*Id.*)

On May 5, 2014, Dr. Brownstein came to a similar conclusion that due to Moore's medical condition, full time, or even part time work, would be "impossible." (*Id.* at 494) Dr. Brownstein stated that Moore easily becomes fatigued and has "good and bad days" from her rheumatoid arthritis injections. (*Id.*)

## C. Hearing Before the ALJ

### 1. Moore's testimony

Moore testified that she became unable to work February 2012 after passing out at work one day. (Tr. at 46) She stated that the pain from her arthritis limits her the most, and that she is in constant pain from her feet to her knees, into her hips, shoulders and hands. (*Id.* at 50) Moore testified that she would rate her pain as a "nine" (on a scale to ten). (*Id.*) She stated that she also has problems with her hands, elbows, knees, ankles, and jaws swelling up at the joints. (*Id.* at 51) Moore also explained that she has fibromyalgia which causes intense pain about ten times per

---

[8] Osteoarthritis is a joint disease in which the cartilage that lines the joints slowly deteriorates. It is also called degenerative joint disease. HARVARD HEALTH PUBLICATIONS: HARVARD MEDICAL SCHOOL, http://www.health.harvard.edu/medical-dictionary-of-health-terms/ (last visited Dec. 13, 2016).

month. (*Id.* at 52–53) Moore stated she also experiences dizziness from swelling in her ears. (*Id.* at 53)

Moore explained that she has had surgeries on both feet. (*Id.* at 54–55) Moore stated that the July 2013 procedure on her left foot was not successful. (*Id.* at 54) In July 2014, Moore had surgery on her right foot. (*Id.* at 55) She explained that the bone in her right toe was shaved down, and a pin was inserted to straighten the toe. (*Id.*) Moore stated the surgery on her right foot was also unsuccessful. (*Id.*)

Moore testified that she is able to walk and stand an average of 20 minutes per day. (*Id.* at 62) She stated she can sit for 10 minutes at a time, and is able to lift one pound. (*Id.*) Moore testified that she cannot bend over at the waist, and is unable to pick up items that have dropped on the floor. (*Id.* at 63–64) Moore explained that she is able to brush her own teeth, but that it is very difficult for her to dry her hair and use a curling iron. (*Id.*)

Moore also testified that her husband and children help her with daily activities. (*Id.* at 66–67) She explained that her son moved back into her home to help her with daily activities. (*Id.* at 59) Her son helps with groceries, laundry, and cooking on a daily basis. (*Id.* at 66–67) Moore explained that she is no longer able to attend church or social activities with friends. (*Id.* 59, 69) She testified that she has become depressed because she is unable to engage in activities she used to do, and is currently on medication for her depression. (*Id.* at 60) Moore stated that she also takes medication for anxiety. (*Id.* at 61)

### 2. Vocational expert testimony

The ALJ posed the following hypothetical to the vocational expert (the "VE"):

[T]his is an individual who is approximately the age of the claimant at the onset year, about age 61. Has a high school education. Able to read, write, and do at least simple math. I will start with a light level of exertion. In this particular hypothetical the posturals are occasional, but no climbing of a ladder, a rope, or a

8

scaffold. In the environmental area, this person should avoid concentrated exposure to extreme cold and vibration. In general, handling, fingering, feeling would be frequent as opposed to constant. Now, with this hypothetical, in your opinion, could such a person do the past work?

(*Id.* at 79) The VE testified that at the light exertional level, the individual described would be able to work in occupations including information clerk, office helper, or sales attendant. (*Id.* at 80–81) The VE explained that Moore's prior work experience as an administrative secretary would apply. (*Id.* at 80) However, Moore could not return to her position as an automobile sales person, because of the possibility of working in extremely cold temperatures during the winter. (*Id.*)

On cross examination, Moore's attorney asked whether a hypothetical individual who was "limited to sitting two hours total in an eight-hour day and standing or walking one-hour total in an eight-hour day" would be able to perform full time work. (*Id.* at 81) The VE stated that such a hypothetical is not representative of full time work. (*Id.*)

Moore's attorney then cited the report by Moore's rheumatologist, Dr. Hosny, and asked whether a hypothetical person with the limitations expressed in that report would be able to perform a secretarial job. (*Id.* at 81–82) The VE stated that the hypothetical person would be unable to perform the secretarial job. (*Id.* at 82)

### 3. The ALJ's findings

Based on the factual evidence in the record and the testimony of Moore and the VE, the ALJ determined that Moore was not disabled under the Act for the relevant time period from February 13, 2012 through the date of the ALJ's decision, July 24, 2014. (Tr. at 22–30) The ALJ found, in pertinent part:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2016.

9

2.  The claimant has not engaged in substantial gainful activity since February 13, 2012, the alleged onset date.

3.  The claimant has the following severe impairments: rheumatoid arthritis and degenerative joint disease bilateral feet.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) subject to the following. She is limited to occasional postural activities but should do no climbing of ladders, ropes or scaffolds; must avoid concentrated exposure to extreme cold and vibration; and handling, fingering and fingering [sic] are limited to frequently as opposed to constantly.

6.  The claimant is capable of performing past relevant work as a secretary. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.

7.  The claimant has not been under a disability, as defined in the Social Security Act, from February 13, 2012, through the date of this decision.

(Tr. at 24–30)

## III.   STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive if

they are supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3) (2015).

Judicial review of the ALJ's decision is limited to determining whether "substantial evidence"

supports the decision. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986).

In making this determination, a reviewing court may not undertake a de novo review of the

ALJ's decision and may not re-weigh the evidence of record. *See id*. In other words, even if the

reviewing court would have decided the case differently, the court must affirm the ALJ's

decision if it is supported by substantial evidence. *See id.* at 1190–91.

10

Substantial evidence is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (quoting *Jesurum v. Sec'y of the United States Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995)). As the United States Supreme Court has explained, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If "reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *See id.* at 250–51 (internal citations omitted). Thus, in the context of judicial review under § 405(g):

> [a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion.

*Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of a claimant's subjective complaints of disabling pain, the ALJ "must consider the subjective pain

11

and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 826 F.2d 240, 245 (3d Cir. 1990).

"Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)). "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. § 405(g) affirm, modify, or reverse the [Commissioner]'s decision with or without remand to the [Commissioner] for rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

## IV.   DISCUSSION

### A.   Disability Determination Process

Title II of the Social Security Act affords insurance benefits "to persons who have contributed to the program and who suffer from a physical or mental disability." 42 U.S.C. § 423(a)(1)(D) (2015); *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant is only disabled if his impairments are so severe that he is unable to do his previous work or engage in any other kind of substantial gainful work existing in the national economy. *Id.* § 423(d)(2)(A); *Barnhart v. Thomas,* 540 U.S. 20, 21–22 (2003). To qualify for disability insurance benefits, a claimant must establish that he was disabled prior to the date he was last insured. 20 C.F.R. § 404.131 (2016); *Matullo v. Bowen*, 826 F.2d 240, 244 (3d Cir. 1990).

12

The Commissioner must perform a five-step analysis to determine whether a person is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel*, 186 F.3d 422, 427–28 (3d Cir. 1999). If the Commissioner makes a finding of disability or non-disability at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)(i). At step one, the Commissioner determines whether the claimant is engaged in any substantial gainful activity. *See id.* §§ 404.1520(a)(4)(i), 416.920(a)(4)(i) (mandating finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a severe combination of impairments. *See id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (mandating finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, at step three, the Commissioner compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches a listed impairment, the claimant is presumed disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to step four and five. *See id.* §§ 404.1520(e), 416.920(e).

At step four, the ALJ considers whether the claimant retains the residual functional capacity (the "RFC") to perform his past relevant work. *See id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Halter*, 247 F.3d 34, 40

(3d Cir. 2001). The claimant bears the burden of demonstrating the inability to return to past relevant work. *See Plummer*, 186 F.3d at 428.

If the claimant is unable to return to past relevant work, at step five, the Commissioner must demonstrate that the claimant's impairments do not preclude him from adjusting to any other available work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (mandating finding of non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with his medical impairments, age, education, past work experience, and [RFC]." *Plummer*, 186 F.3d at 428. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether he or she is capable of performing work and is not disabled. *See id.* The ALJ often seeks the VE's assistance in making this finding. *See id.*

## B. Whether the ALJ's Decision is Supported by Substantial Evidence

On June 10, 2014, the ALJ found Moore was not disabled within the meaning of the Act from the alleged onset date of February 13, 2012, through the date of the hearing. (Tr. at 22–30) The ALJ concluded that, despite Moore's severe impairments (rheumatoid arthritis and degenerative joint disease bilateral feet), she had the residual functional capacity to perform light work. (*Id.* at 24, 26) After considering the VE's testimony, the ALJ found that Moore could return to her past relevant work as a secretary. (*Id.* at 30)

Moore asserts three main arguments on appeal: (1) the ALJ improperly dismissed Moore's other impairments as non-severe; (2) the ALJ improperly discounted Moore's treating physicians' opinions; and (3) the ALJ's residual functional capacity finding and hypothetical did

not include all of the limitations supported by the evidence of record. (D.I. 11 at 5, 11; D.I. 16 at 3)

## 1. Severity Findings

### A. Mental Impairments

Moore contends that the ALJ improperly found her depression not severe, because the medical evidence supports a finding that her depression caused more than a minimal effect on her ability to sustain employment. (D.I. 11 at 6–9) Specifically, Moore alleges that the ALJ erred in failing to include limitations relevant to Moore's mental impairments in the RFC assessment. (*Id.*)

To reach her conclusion that Moore does not have a severe mental impairment, the ALJ assessed functional limitations using the four broad functional areas set out in the disability regulations for evaluating mental disorders. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C). First, with respect to activities of daily living, the ALJ found no limitation.[9] (Tr. at 25) The ALJ based her finding primarily upon Moore's own testimony and statements, and consultative mental and physical examination reports. Moore reported the ability to cook, clean, shop, do crossword puzzles, garden, keep up with personal care, walk, drive, see friends, attend church, and use a computer for Facebook and games. (*Id.* at 380) The court finds that substantial evidence supports the ALJ's conclusion that Moore did not exhibit marked restriction in activities of daily living.

---

[9] According to the Social Security regulations, "activities or daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(1).

15

Second, the ALJ found no limitation in social functioning.[10] (Tr. at 25)  Initiating social

contact with others, communicating clearly with others, or interacting and actively participating

in group activities are indicative of strength in social functioning. *See* C.F.R. Pt. 404, Subpt. P,

App. 1, § 12.00(C)(2).  Moore testified that she lives with her husband, and enjoys visiting with

her children who help her around the house. (Tr. at 59)  Moore also stated that she has a friend

that comes over to visit her. (*Id.*)  The court finds there is substantial evidence that supports the

ALJ's finding that Moore has no restriction in social functioning.

Third, the ALJ found that Moore has only a mild limitation in the functional area of

concentration, persistence, and pace.[11] (Tr. at 25)  Moore testified that she has trouble with

memory and concentration, and has her husband remind her about appointments. (Tr. at 58)

Moore testified that she enjoys reading, often for extended periods of time, and uses her Kindle

in bed because it is lighter and easier to hold than a book. (*Id.* at 65)  At the hearing, the ALJ

noted that Moore showed excellent memory and concentration. (*Id.* at 29)  The court finds that

substantial evidence supports the ALJ's conclusion that Moore did not exhibit marked restriction

in concentration, persistence, or pace.

Fourth, the ALJ found no episodes of decompensation which have been of extended

duration.[12] (*Id.* at 25)  The ALJ noted there is no evidence of any episodes of decompensation or

inpatient mental health treatment during the relevant time period. (*Id.*)

---

[10] According to the Social Security regulations, "social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals." *Id.* at § 12.00(C)(2).

[11] According to the Social Security regulations, "Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." *Id.* at § 12.00(C)(3).

[12] "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration,

Because Moore's medically determinable depression caused no more than "mild" limitations in any of the first three functional areas and no episodes of decompensation of extended duration in the fourth area, the ALJ properly found the condition non-severe. 20 C.F.R. § 404.1520a(d)(1).  The ALJ observed that Moore's treatment for depression remained limited to medication prescribed by her primary care physician, Dr. Brownstein, and noted that Moore never required inpatient treatment or treatment with a psychiatrist. (Tr. at 25)  This is consistent with Dr. Brownstein's treatment notes, which reveal that Dr. Brownstein prescribed Wellbutrin and Prozac to treat Moore's depression, but Moore never sought counseling. (*Id.* at 24–25, 57)  The ALJ gave great weight to the opinions of Dr. Brownstein and Dr. Hosny whose records do not show any significant or persistent symptoms or clinical findings related to a mental health disorder. (*Id.* at 25)

### B.  Fibromyalgia

Moore also contends that the ALJ improperly found her fibromyalgia non-severe, because the medical evidence supports a finding that her fibromyalgia impedes her ability to work and to participate in daily living activities. (D.I. 11 at 9–11)

To reach her conclusion that Moore's fibromyalgia is not severe, the ALJ assessed Moore's medical records. (Tr. at 26–30)  The ALJ gave great weight to Dr. Chavarry's report that stated Moore had no trigger points consistent with fibromyalgia and minimal rheumatoid arthritis findings on examination. (*Id.* at 28)  Dr. Chavarry also noted that Moore reported that she was unable to flex beyond thirty degrees at the hip during formal testing, but Dr. Chavarry observed her doing so without any discomfort or restriction while retrieving her belongings. (*Id.*)

---

persistence, pace…and ordinarily requires increased treatment or a less stressful situation (or a combination of the two)." *Id.* at § 12.00(C)(4).

Also, Dr. Chavarry noted that Moore exhibited significantly diminished grip strength in the right hand when formally tested, but then had no difficulty retrieving her handbag that contained multiple folders and paperwork. (*Id.*)

Moore previously demonstrated 18/18 fibromyalgia trigger points, but the ALJ noted that there are no clinical observations to support the extreme pain and fatigue alleged. (*Id.* at 29) Additionally, Moore did not show any acute distress at the hearing. (*Id.*) Thus, Moore's medical records provide enough information for the ALJ to conclude that her fibromyalgia is non-severe.

## 2. The ALJ properly weighed the objective medical evidence and opinions of Moore's treating physicians

Moore argues that the ALJ failed to properly weigh the medical opinions of Dr. Brownstein, Dr. Tam, and Dr. Hosny. (D.I. 11 at 11–14) Moore claims that the ALJ improperly rejected the opinions of the three doctors, despite the consistency of the physicians' records. (D.I. 11 at 11–14; D.I. 16 at 3)

To determine the proper weight to give to a medical opinion, the ALJ is required to weigh all the evidence and resolve any material conflicts. *See Richardson v. Perales*, 402 U.S. 389, 399 (1971). Generally, the weight afforded to any medical opinion is dependent on a variety of factors, including the degree to which the opinion is supported by relevant evidence and consistent with the record as a whole. 20 C.F.R. § 404.1527(c)(3)–(4) (2012). To that end, the more consistent an opinion is with the record as a whole, the more weight is given to that opinion. *Id.* § 404.1527(c)(4).

The ALJ must first assess whether a medical opinion is from a treating, non-treating, or non-examining source. 20 C.F.R. §§ 404.1502, 416.902; *see also Fletcher v. Colvin*, Civil Action No. 12-920-SRF, 2015 WL 602852, at *9 (D. Del. Feb. 11, 2015), *report and*

18

*recommendation adopted*, 2015 WL 1284391 (D. Del. Mar. 19, 2015). The opinion of a treating physician—one who has an "ongoing treatment relationship" with the patient—is entitled to special significance. 20 C.F.R. §404.1502; *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(d)(2)). On the other hand, a treating physician's opinion does not warrant controlling weight if unsupported by clinical and laboratory diagnostic findings, and if it is inconsistent with other substantial evidence. *See* 20 C.F.R. § 404.1527(c)(2); *Fargnoli*, 247 F.3d at 42–43. The more a treating source presents medical signs and laboratory findings to support the medical opinion, the more weight it is given. *See Robinson v. Colvin*, Civ. No. 14-662-SLR, 2015 WL 5838469, at \*12 (D. Del. Oct. 5, 2015). Likewise, the more consistent a treating physician's opinion is with the record as a whole, the more weight it should be afforded. *Id.*

An ALJ may not reject a treating physician's assessment based on his or her own credibility judgments, speculation, or lay opinion, and the ALJ cannot disregard a treating physician's opinion without explaining his or her reasoning or referencing objective conflicting medical evidence. *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000); *Gilliland v. Heckler*, 786 F.2d 178, 184 (3d Cir. 1986). Even when the treating source opinion is not afforded controlling weight, the ALJ must determine how much weight to assign it by considering factors such as length, nature, and frequency of treatment visits, nature and extent of the treatment relationship, whether the opinion is supported by medical evidence, whether the opinion is consistent with the medical record, and the medical source's specialization. 20 C.F.R. §§ 404.1527(d), 416.927(d).

In the present case, Dr. Brownstein, Dr. Hosny, and Dr. Tam all provided narrative reports or statements stating Moore is unable to work and totally disabled. (Tr. at 321, 479, 486, 493, 494) However, the ALJ did not find these opinions persuasive, because the objective

medical findings, conservative and routine treatment history, and the extensive self-reported activities from Moore did not support the extreme limitations assessed. (*Id.* at 29) For example, during Dr. Chavarry's evaluation, Moore stated that she felt like her fibromyalgia was in a dormant state (*Id.* at 379) Also, as part of the evaluation, Moore filled out a questionnaire stating she is responsible for caring for and feeding her cats, making her bed, and doing chores around the house. (*Id.* at 380) Moore also wrote on the questionnaire that she still drives, cooks, and leaves the house for groceries and shopping. (*Id.*)

Moreover, the opinions of Dr. Brownstein, Dr. Hosny, and Dr. Tam regarding Moore's ability to perform low stress jobs are not entitled to controlling weight. The Commissioner's regulations explain that medical source opinions that a claimant is "disabled" or "unable to work" are not medical opinions and are not given special significance because opinions as to whether or not a claimant is disabled are reserved for the Commissioner. 20 C.F.R. § 404.1527(d). The court finds that substantial evidence supports the ALJ's decision to assign less than controlling weight to the opinions of Dr. Brownstein, Dr. Hosny, and Dr. Tam.

### 3. Sufficiency of the RFC assessment

Moore argues that the ALJ improperly failed to consider certain limitations in the hypothetical, including: (1) manipulative limitations; and (2) depressive symptoms, which would prevent Moore from being able to perform highly skilled work. (D.I. 11 at 6–15) Reliance on an expert's answer to a hypothetical question will not constitute substantial evidence unless all credibly established limitations are included; remand is required where the hypothetical question is deficient. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005); *Anderson v. Astrue*, 825 F. Supp. 2d 487, 498 (D. Del. 2011) (citations omitted). "A hypothetical question must reflect all of a claimant's impairments that are supported by the record; otherwise the question is

deficient and the expert's answer to it cannot be considered substantial evidence." *Chrupcala v.*

*Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987). Third Circuit case law and governing regulations

have provided guidance on whether a limitation is "credibly established:"

> Limitations that are medically supported and otherwise uncontroverted in the
> record, but that are not included in the hypothetical question posed to the expert,
> preclude reliance on the expert's response. Relatedly, the ALJ may not substitute
> his or her own expertise to refute such record evidence. Limitations that are
> medically supported but are also contradicted by other evidence in the record may
> or may not be found credible—The ALJ can choose to credit portions of the
> existing evidence but cannot reject evidence for no reason or for the wrong
> reason. Finally, limitations that are asserted by the claimant but that lack objective
> medical support may possibly be considered nonetheless credible. In that respect
> the ALJ can reject such a limitation if there is conflicting evidence in the record,
> but should not reject a claimed symptom that is related to an impairment and is
> consistent with the medical record simply because there is no objective medical
> evidence to support it.

*Rutherford*, 399 F.3d at 554.

The ALJ appropriately considered Moore's manipulative limitations in determining

which credibly established limitations should be accounted for in the hypothetical and RFC

assessment. Specifically, the ALJ noted that Moore's symptoms were well-controlled. (Tr. at

28) For example, treatment notes showed that Moore only experienced occasional swelling in

the hands. (*Id.* at 29) In April 2013, Dr. Brownstein wrote that Moore had "full range of

movement in all joints," and that there was "no visible swelling in any joint." (*Id.* at 418, 421)

Moore testified that when using both hands she can lift a gallon of milk, and can button and zip

her own clothing. (*Id.* at 63–64) Also, during Dr. Chavarry's evaluation, she observed Moore

retrieve her handbag with no difficulty. (*Id.* at 382) Dr. Chavarry noted that Moore's muscle

strength was +5/5 in the arms and legs, with normal reflexes. (*Id.* at 382) The ALJ nevertheless

accounted for Moore's complaints of pain and difficulty by including manipulative limitations.[13]
The ALJ appropriately concluded that Moore's complaints of extreme manipulative limitations
were not supported by the medical evidence of record, and, consequently, the ALJ was not
obliged to include additional limitations in the hypothetical and RFC assessment. *See Rutherford*,
399 F.3d at 554.

However, the ALJ failed to account for limitations resulting from Moore's medically
determinable depression in the hypothetical posed to the VE and the RFC assessment. While
ultimately concluding that Moore's depression was non-severe, the ALJ nonetheless
acknowledged that Moore suffered from "medically determinable affective disorder" which
causes "minimal limitation in [Moore's] ability to perform basic mental work activities." (*Id.* at
24)

Having found that Moore's non-severe depression was medically supported, and having
acknowledged that there were mild limitations associated therewith, the ALJ had a duty to
address those limitations in the RFC assessment and the hypothetical question posed to the VE.
*See Harmon v. Astrue*, 2012 WL 94617, at *2 (E.D. Pa. Jan 11, 2012) (citing *Washington v.
Astrue*, 2009 WL 855893, at *1 (E.D. Pa. Mar. 31, 2009); *Davis v. Astrue*, 2007 WL 2248830, at
*3–4 (E.D. Pa. July 30, 2007); *Thompson v. Barnhart*, 2006 WL 709795, at *13–15 (E.D. Pa.
Mar. 15, 2006)). The ALJ's failure to analyze in detail the effects of Moore's mental limitations
on Moore's ability to work at steps four and five was particularly important in view of the ALJ's
conclusion that Moore could perform her skilled past relevant work as a secretary. (Tr. at 30)
Courts have found that "even minimal deficits in these areas of functioning could impact [a

---

[13] The RFC states, "handling, fingering and fingering [sic], are limited to frequently as opposed
to constantly." (Tr. at 79)

plaintiff's] ability to successfully perform the [skilled] occupation." *See Harmon*, 2012 WL 94617, at \*2. The ALJ's failure to include all of the limitations she found to be associated with Moore's medically determinable affective disorder in her RFC assessment and the hypothetical posed to the VE constitutes legal error. Consequently, this case must be remanded to allow the ALJ to reconsider any such limitations stemming from Moore's medically determinable affective disorder.

Moore also contends that substantial evidence does not support the ALJ's determination that Moore is able to perform her skilled past relevant work as a secretary. (D.I. 11; D.I. 16) Having concluded that remand is warranted to give the ALJ an opportunity to include all credible limitations in the RFC assessment, the court need not reach a determination on Moore's ability to perform her past relevant work at this time.

## V. CONCLUSION

For the foregoing reasons, I recommend that the court grant Moore's motion for summary judgment (D.I. 10) and deny the Commissioner's cross-motion for summary judgment (D.I. 14). I further recommend that the court reverse the Commissioner's decision and remand the case to the Commissioner with instructions to:

1) Consider the limitations associated with Moore's medically determinable affective disorder in combination with the limitations associated with Moore's impairments of rheumatoid arthritis and degenerative joint disease bilateral feet;

2) Address the foregoing limitations in the hypothetical question posed to the VE; and

3) Re-assess Moore's RFC and her ability to return to past relevant work.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections

23

within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The objection and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006*)*; *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: February 17, 2017

Sherry R. Fallon
United States Magistrate Judge